RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0341p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DENISE HUGHES,

　　　　　*Plaintiff-Appellant/Cross-Appellee,*

　　　*v.*

REGION VII AREA AGENCY ON AGING et al.,

　　　　　*Defendants-Appellees/Cross-Appellants.*

Nos. 07-1570/1647

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 04-10355—David M. Lawson, Thomas L. Ludington, District Judges.

Argued: July 25, 2008

Decided and Filed: September 8, 2008

Before: MOORE and SUTTON, Circuit Judges; ALDRICH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Kim A. Higgs, LAW OFFICE, Bay City, Michigan, for Appellant. Brian K. Elder, Bay City, Michigan, for Appellees. **ON BRIEF:** Kim A. Higgs, LAW OFFICE, Bay City, Michigan, for Appellant. Brian K. Elder, Bay City, Michigan, for Appellees.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant/Cross-Appellee Denise Hughes ("Hughes") appeals the dismissal of her lawsuit against Defendants-Appellees/Cross-Appellants Region VII Area Agency on Aging ("Region VII"), Region VII Executive Director Bruce King ("King"), and Region VII Assistant Director Drew Orvosh ("Orvosh"). Hughes claims that Region VII, King, and Orvosh (collectively, "Defendants") retaliated against her exercise of First Amendment rights when she received a two-day suspension in July 2004 after a conversation with a co-worker and when she was terminated on August 6, 2004, from her position as a Program Coordinator at Region VII allegedly due to her discussions with a local newspaper reporter. Hughes later amended her complaint to include allegations that Defendants violated the Fair Labor Standards Act ("FLSA").

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

1

In March 2006, the district court denied Defendants' motion for summary judgment, ruling that Region VII is subject to suit under 42 U.S.C. § 1983. *Hughes v. Region VII Area Agency on Aging*, 423 F. Supp. 2d 708 (E.D. Mich. 2006); Joint Appendix ("J.A.") at 578-600. In February 2007, the district court ruled that Hughes's FLSA claim was barred by the statute's two-year statute of limitations but ordered additional briefing regarding Hughes's First Amendment claim and whether her FLSA claim was timely under a "continuing violation" theory. J.A. at 1155-57 (Feb. 22, 2007, Order at 4-6). In April 2007, the district court granted Defendants' motion for summary judgment, ruling that Hughes's First Amendment claim failed because none of her alleged speech involved a matter of public concern. J.A. at 1369, 1377-79 (Op. & Order Granting Summ. J. at 5, 13-15). The district court also ruled that Hughes's FLSA claim was untimely and dismissed the claim with prejudice. J.A. at 1369 (Op. at 5).

Hughes now appeals as to both her First Amendment and FLSA claims, and Defendants cross-appeal the district court's ruling that Region VII is a state actor and subject to suit under 42 U.S.C. § 1983. For the reasons discussed below, we **AFFIRM** the district court's ruling that Region VII is subject to suit under § 1983. Because we conclude that Hughes's speech did relate to a matter of public concern and that Hughes's FLSA claims were timely, we **REVERSE** the district court's grant of summary judgment as to her First Amendment claim and the district court's dismissal with prejudice of her FLSA claims, and we **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

Hughes worked as a Program Coordinator at Region VII beginning in January 2002 until her termination on August 6, 2004. *Hughes v. Region VII Area Agency on Aging*, 423 F. Supp. 2d 708, 710 (E.D. Mich. 2006) ("*Hughes*"); Appellant/Cross-Appellee Br. at 5-6. In 1975, three private individuals incorporated Region VII as a non-profit Michigan corporation; in 1985, however, the articles of incorporation were amended, providing for organization on a membership basis. Region VII receives almost all of its funding from the state and federal governments, and the agency is responsible for distributing those funds to service providers for the elderly in a ten-county region of Michigan, which consists of the following counties: Bay, Clare, Gladwin, Gratiot, Huron, Isabela, Midland, Saginaw, Sanilac, and Tuscola. The 1985 amendment to the articles of incorporation made those ten counties the sole members of the membership corporation; a further amendment to the articles in 1997 made the city of Saginaw a member of Region VII as well. The government-members of Region VII pay a yearly membership fee to Region VII, which totaled approximately $42,000 in the 2004 fiscal year. J.A. at 107 (King Aff. ¶ 6). The board of directors for Region VII consists of twelve voting board members; each of the eleven governmental bodies appoints a representative to the board of directors for Region VII, and those eleven board members then select one additional member of the board. *Hughes*, 423 F. Supp. 2d at 710; J.A. at 115 (By-Laws at 2).

Region VII designated Hughes as an exempt administrative employee under FLSA. J.A. at 863 (King Aff. ¶ 7). Hughes's "primary responsibility was to assess and audit service providers to determine their compliance with the service agreements and the regulations connected to State and federal funding." J.A. at 863 (King Aff. ¶ 8). Hughes earned a yearly salary of approximately $38,000, and she "had no direct, daily supervision" and received "broad discretion on how to accomplish her duties." J.A. at 864, 863 (King Aff. ¶¶ 16, 15, 13).

In early 2004, Steve Neavling ("Neavling"), a reporter for the Bay City Times newspaper, began covering Region VII as part of his beat covering Bay County. J.A. at 2067 (Neavling Dep. at 10). In May 2004, Neavling asked Diane Brady ("Brady"), an employee at Region VII, to inquire whether Hughes would speak to him regarding a sexual harassment lawsuit that had been filed against King, the Executive Director of Region VII, by Shelly Mott ("Mott"), a Region VII

employee and registered nurse. J.A. at 751 (Hughes Dep. at 41-42). Neavling and Hughes had several conversations on the telephone and met twice in person to discuss events at Region VII. J.A. at 751-54 (Hughes Dep. at 41-56). At her deposition, Hughes stated that her conversations with Neavling concerned a number of incidents relating to King, including observing King miss a meeting after receiving a call from Mott and observing King and Mott leave together from an evening event. J.A. at 751-52 (Hughes Dep. at 41-48). Hughes stated that she told Neavling that Mott eventually became concerned and asked other employees to walk her to her car when she left the building. J.A. at 752 (Hughes Dep. at 46). Hughes also stated that she had discussion with Neavling regarding King's sons' involvement. J.A. at 753 (Hughes Dep. at 51).

Hughes stated in her deposition that, in late June 2004, Hughes talked with Kerry Williams, a fellow Region VII employee, after Hughes attended a public meeting, and that their conversation related to possible future cuts to the Region VII budget. J.A. at 761-62 (Hughes Dep. at 84-85). Hughes believed that the possible cuts would affect jobs in the program on which Kerry Williams worked, and Hughes stated that she "was looking for input on how we were going to try to look at promotions again, and if there was, you know, any state push that was being formed again because, you know, previously there was a whole big campaign that was put out to keep that funding in place." J.A. at 762 (Hughes Dep. at 85). Hughes also stated that she spoke to a Region VII employee about a recent project RFP, or request for proposal, telling the employee that "it was out for rebidding again" because Hughes believed "that was public information at that point" because Hughes had sent an "announcement . . . back out to the newspapers to be published." J.A. at 761 (Hughes Dep. at 84, 83).

On June 29, 2004, Kerry Williams wrote a note to Ovrosh in which Williams stated that "[o]n Friday June 25, 2004, Denise [Hughes] informed me that [she heard information at] the Advisory Council that (due to the budget) R7 may be consolidating jobs." J.A. at 137 (Williams Note); J.A. at 1804 (Orvosh Dep. at 126). Williams's note to Orvosh also included the claim that Williams "was . . . approached this day by Kara Perez [another Region VII employee] regarding the VNSS contracted services. She was told by Denise [Hughes] that VNSS didn't bid on the services because that wasn't the direction they wanted to go. I advised her at that time that I wasn't at liberty to discuss that with her." J.A. at 137; J.A. at 1805 (Orvosh Dep. at 127).

At his deposition, Orvosh discussed meeting with Kerry Williams about her note. J.A. at 1793-1816 (Orvosh Dep. at 115-38). Orvosh stated that Williams informed him that Kara Perez was "upset" about comments that Hughes made to Perez regarding the possible consolidation of jobs. J.A. at 1793 (Orvosh Dep. at 115). On June 30, 2004, the day after receiving Williams's note, Orvosh, Region VII's assistant director, reprimanded Hughes for her conversations with her co-workers. *Hughes*, 423 F. Supp. 2d at 711; J.A. at 136 (June 30, 2004 Written Reprimand). Orvosh conceded that, prior to issuing the reprimand, he did not talk to Hughes to hear her account of the conversation, nor did he even talk to Kara Perez. J.A. at 1812, 1810 (Orvosh Dep. at 134, 132). Orvosh's reprimand stated that Hughes's discussion of the possible budget cuts with Williams and the RFP status with Perez "demonstrated inappropriate conduct and performance." J.A. at 136 (Reprimand). The reprimand letter also claimed that Hughes had not ensured that parties contracting with Region VII had met certain criteria. J.A. at 136 (Reprimand). Based on the reprimand, King and Orvosh imposed a two-day unpaid suspension on July 7-8, 2004, against Hughes. J.A. at 138 (Suspension Notice).

In her deposition, Hughes described seeing a list on King's desk that had six names written on it underneath the words "Bay City Times." J.A. at 755 (Hughes Dep. at 58-60). Hughes could not remember exactly when she saw the list on King's desk. J.A. at 755 (Hughes Dep. at 59). Hughes believed that the list was of persons whom King suspected of talking to the Bay City Times about events at Region VII. *Id.* Hughes recalled that her name, as well as Mott's and Brady's names, appeared on the list. *Id.* Hughes described a conversation on July 1, 2004, that she had at

work at Region VII with Brady, after a discussion at a board meeting about the Michigan Freedom of Information Act and Region VII's policy for responding to media requests. J.A. at 754-55 (Hughes Dep. at 55-58). Hughes stated that she and Brady joked about how "someone must be asking questions or they wouldn't have to be drafting a policy." *Id.* Although neither she nor Brady said that they had talked to Bay City Times, Hughes stated that others might have overhead their conversation and suspected them of talking to the Bay City Times. *Id.*

On July 1, 2004, Region VII fired Brady, who had earlier requested that the Region VII board of directors investigate King due to Mott's sexual-harassment allegations. J.A. at 2105-06 (Sept. 7, 2004 Bay City Times article). By this time, Region VII had agreed to a confidential settlement with Mott regarding her sexual-harassment lawsuit against King and had recently paid Mott the amount of her settlement. *Id.* At her deposition, Hughes stated that she spoke to Neavling about Brady's termination, giving her opinion that Brady's termination "was related to the fact that she had wanted Shelly Mott's case to be investigated" and that Hughes did not think "there was any basis for [Brady's] termination." J.A. at 753 (Hughes Dep. at 50).

Neavling stated at his deposition that he recalled telling King that he had been speaking to Hughes about Region VII. J.A. at 2082-85 (Neavling Dep. at 25-28). He remembered King asking "who my sources were and then saying—and then he said, we know it's Denise Hughes or something like that and I said well, she's not the only person talking to me." J.A. at 2084-85 (Neavling Dep. at 27-28). Neavling could not recall exactly when this conversation took place, but he was certain that Hughes was still employed by Region VII when he confirmed to King that Hughes was one of his sources. J.A. at 2082-83 (Neavling Dep. at 25-26).

Hughes's employment at Region VII ended on August 6, 2004, when Orvosh notified Hughes during a telephone conversation that she was fired. *Hughes*, 423 F. Supp. 2d at 711; J.A. at 159 (Hughes Personnel File Document). The Bay City Times published several articles regarding Region VII in August and September 2004, detailing the "turmoil" at the agency. J.A. at 2090-2106 (Bay City Times Articles). One article noted that "16 employees from a 30-person staff either have quit or were fired or laid off" and an editorial asserted that a "probe would help clear the air" at the agency. J.A. at 2102-03 (Bay City Times Articles). The editorial noted that King, the Executive Director of Region VII, had settled a sexual-harassment suit, that several employees had departed or been fired, that King's sons received $1,117 "for some work and computer parts" from the agency, and described Region VII's conduct as revealing "a cavalier attitude among those entrusted with taxpayer money to help our oldest citizens." J.A. at 2103-04 (Bay City Times Editorial). The editorial questioned whether "it is time for state and local leaders to question whether these area agencies on aging are necessary" given that "[t]hey exist only as a means of passing along state and federal money to local programs," and the editorial concluded that "it's time once again for federal and state investigators to take a close look at how the agency has been run recently." *Id.*

Hughes filed this lawsuit on December 16, 2004, and filed an amended complaint in March 2005. *Hughes*, 423 F. Supp. 2d at 711; J.A. at 2-54 (Compl. and Am. Compl.). Defendants filed a motion for summary judgment in March 2005, J.A. at 55-164 (Defs.' Mot. for Summ. J.), and Hughes filed a response in April 2005, J.A. at 165-228 (Pl.'s Resp. to Mot. for Summ. J.). The district court referred the matter to a Magistrate Judge, who in August 2005 issued a Report and Recommendation recommending that Defendants' motion for summary judgment be granted on the ground that Region VII was not subject to suit under § 1983. J.A. at 427-44. In March 2006, the district court issued an opinion and order rejecting the Magistrate Judge's conclusion, reasoning that under the Supreme Court decision in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), "the Agency's director [King] cannot avoid a determination that his official action was under color of law" because "[t]he state and local governments in Michigan are at least as entwined with the Region VII Agency as were the public school districts in

*Brentwood.*” *Hughes*, 423 F. Supp. 2d at 717-18. On April 11, 2006, Defendants filed a motion for reconsideration, J.A. at 601-07, which the district court denied on April 20, 2006. J.A. at 640-41.

On July 17, 2006, Hughes filed a motion for leave to file a second amended complaint, which included for the first time a claim under the FLSA. J.A. at 644-77. On July 27, 2006, the district court issued an order denying Hughes's motion for leave to file a second amended complaint on the ground that Hughes failed to comply with a local court rule requiring “a movant to seek concurrence in the relief requested before filing a motion with this Court.” J.A. at 719-20 (Order). Hughes eventually complied with the local rule, and her second amended complaint was formally filed on September 19, 2006. J.A. at 954-78 (Second Am. Compl.).

Defendants filed a motion for summary judgment in December 2006, J.A. at 997-1015, and in January 2007 Hughes filed a response, J.A. at 1077-99. In February 2007, the district court entered an order that requested supplemental briefing regarding evidence in the record “identifying the content of [Hughes's] purportedly First Amendment-protected speech” as well as briefing relating to Hughes's FLSA claim. J.A. at 1152–59, 1157. Defendants filed a supplemental brief in March 2007, J.A. at 1163-69, and Hughes filed a supplemental brief on April 4, 2007, J.A. at 1227-46. Defendants filed a reply brief on April 11, 2007, J.A. at 1353-58, and Hughes also filed a reply brief on April 11, 2007, J.A. at 1359-64.

On April 27, 2007, the district court entered an order granting Defendants' motion for summary judgment, stating that “the Court remains uncertain of the precise content of [Hughes's] alleged speech” and “conclud[ing], as a matter of law, that [Hughes's] speech, to the extent shown in this record, did not address a matter of public concern.” J.A. at 1377, 1379 (Op. at 13, 15). The district court did, however, conclude that “[g]enuine issues of material fact remain regarding the element of causation” and regarding “whether her employer would have terminated her employment regardless of her speech.” J.A. at 1376-77 (Op. at 12-13). The district court also concluded that Hughes's FLSA claim was untimely and dismissed that claim with prejudice. J.A. at 1369 (Op. at 5).

Hughes filed a notice of appeal on May 9, 2007, J.A. at 1383-84, and Defendants filed a notice of cross-appeal on May 29, 2007, J.A. at 1386-87.

## II. ANALYSIS

### A. Whether Region VII Is Subject to Suit Under § 1983

#### 1. Legal Standards

“Section 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law.” *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005). “A private actor acts under color of state law when its conduct is ‘fairly attributable to the state.’” *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 947 (1982)). The Supreme Court's “cases have identified a host of facts that can bear on the fairness of such an attribution.” *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). In particular, the Supreme Court has held that “a challenged activity may be state action . . . when it is ‘entwined with governmental policies’ or when government is ‘entwined in [its] management or control.’” *Id.* (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301 (1966)) (alteration in original). The Supreme Court has explained that the state-action analysis often “looks not to form but to an underlying reality” and stated in *Brentwood* that it had partially “reli[ed] on the practical certainty in this case that public officials will control operation of the Association under its bylaws.” *Id.* at 301 n.4. “[W]e review the state action aspect of the district court's decision *de novo*.” *Romanski*, 428 F.3d at 636.

### 2. Analysis

Defendants appeal the district court's March 2006 ruling, in which the district court held that Region VII is subject to suit under § 1983 because, under *Brentwood*, Region VII acts under color of state law due to the pervasive entwinement of governmental entities in the management and control of Region VII. We conclude that Defendants' arguments lack merit.

We begin by providing an overview of the extensive statutory and regulatory framework that governs Area Agencies on Aging such as Region VII. In 1965, Congress passed the Older Americans Act, which "established an Administration on Aging to carry out the mandate of the Act" and which "require[d] each State to create a state agency" to be responsible for determining the intrastate distribution of funds given to the State by the federal government. *Hughes*, 423 F. Supp. 2d at 714 (citing 42 U.S.C. §§ 3011, 3025). "In 1981, Michigan passed the Older Michiganians Act," which "established a commission on services to the aging." *Id.* (citing MICH. COMP. LAWS § 400.581 *et seq.*). The Commission was "established within the executive office of the governor" and "consist[s] of 15 members appointed by the governor by and with the advice and consent of the senate." MICH. COMP. LAWS § 400.583(1). The Older Michiganians Act ("OMA") requires that the Commission "[d]esignate planning and service areas and an agency which shall be recognized as an area agency on services to the aging within each planning and service area." MICH. COMP. LAWS § 400.584(1)(i). The OMA permits four types of organizations to act as an area agency on aging ("AAA"), including "[a] public or *nonprofit private agency*, except a regional or local agency of the state, *that is under the supervision or direction of the state agency*." MICH. COMP. LAWS § 400.589(1)(d) (emphasis added). The OMA "then lists the duties and powers of the AAA, which include administering an area plan, entering into contracts, and serving as an advocate for older persons." *Hughes*, 423 F. Supp. 2d at 715 (citing MICH. COMP. LAWS § 400.589(2)).

The OMA also created the office of services to the aging ("OSA") in the department of management and budget, and the OMA provided that "[t]he governor shall appoint a director of the office by and with the advice and consent of the senate" and that "[t]he director shall receive compensation as provided by the legislature." MICH. COMP. LAWS § 400.585. The OSA must "[s]upervise, monitor, assess, evaluate, and provide technical assistance to area agencies on aging," such as Region VII. MICH. COMP. LAWS § 400.586(k).

The OMA authorized the OSA and the Commission to promulgate rules to implement the OMA. MICH. COMP. LAWS § 400.591. As the district court noted, the OSA's "rules are very specific about what AAAs may and may not do." *Hughes*, 423 F. Supp. 2d at 715 (citing MICH. ADMIN. CODE r. 400.20101-400.20615). For instance, the regulations establish that a grantee[1] such as Region VII "shall not consummate a contract using funds made available, in whole or in part, through the office until an area plan . . . has been approved by the commission" and that "[a] grantee [such as Region VII] shall contract for only those services enumerated in the area plan or other document detailing the proposed use of funds which has been approved by the commission." MICH. ADMIN. CODE r. 400.20105(1)-(2). Under the regulations, grantees such as Region VII must also establish various appeals mechanisms and procedures for contractors to appeal a "contract that has been suspended, terminated, or not renewed" and must ensure that the appeals procedures contain sufficient notice of various rights. MICH. ADMIN. CODE r. 400.20107(1)-(2).

The regulations further provide that "[a]rea agencies [such as Region VII] shall develop a comprehensive and coordinated area plan for the delivery of nutrition and supportive services to

---

[1] The regulations provide that a "'[g]rant' means an award of funds by the office to an area agency . . . under provisions of an approved area plan" and that a "'[g]rantee' means the entity to which a grant is awarded [i.e., an AAA such as Region VII,] and which is accountable to the office for the use of funds provided." MICH. ADMIN. CODE r. 400.20101(i)-(j).

older persons for their respective" regions and that AAAs must "have written procedures for the conduct of public hearings" regarding the adoption of "[t]he area plan." MICH. ADMIN. CODE r. 400.20402(2); r. 400.20406(3). The regulations require that "[a]rea agencies, as part of the area plan, shall describe the rationale for allocating funds made available through grants within" their respective regions and also require that "[a]rea agencies shall adopt written procedures . . . to govern" the AAA's "board of directors," their "handling of administrative complaints generated by service providers," and their "[a]ssessment of contractors." MICH. ADMIN. CODE r. 400.20405(5); r. 400.20406(2). Finally, the regulations state that such written procedures "shall be officially adopted by action of the entity's governing body" and that before adopting the procedures there must be "an opportunity for comment on the proposed operating procedures by local governments, contractors, and affected agencies" and that "[n]otice of opportunity for comment shall be published in a newspaper" at least fourteen days prior to the AAA's adoption of the procedures. MICH. ADMIN. CODE r. 400.20106(2).

As the Michigan Court of Appeals has observed, these numerous statutory and regulatory provisions "clearly establish[] that the fourteen AAAs are subordinate to, and subject to the supervision of, the commission." *Detroit Area Agency on Aging v. Office of Services to the Aging*, 534 N.W.2d 229, 232 (Mich. Ct. App. 1995). And the commission, of course, is the body created by the OMA "within the executive office of the governor" and staffed by "15 members appointed by the governor by and with the advice and consent of the senate." MICH. COMP. LAWS § 400.583(1).

As stated above, in *Brentwood* the Supreme Court noted that "a challenged activity may be state action . . . when it is 'entwined with governmental policies' or when government is 'entwined in [its] management or control.'" 531 U.S. at 296 (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301 (1966)) (alteration in original). The extensive statutory and regulatory provisions detailed above show that government is *deeply* "'entwined in [the] management or control'" of Region VII: government entities are the sole members of Region VII and they appoint eleven members of Region VII's board of directors, with their chosen representatives appointing the final member of the board. Furthermore, virtually every act that Region VII performs must receive approval from a state agency, and the very existence of Region VII as a "designated" area agency on aging depends upon Region VII being "*under the supervision or direction of the state agency*." MICH. COMP. LAWS § 400.589(1) (emphasis added). The entwinement of government in the management and control of Region VII is thus a matter of statutory policy, in addition to the fact that the membership of Region VII consists *entirely* of governmental entities.

In *Brentwood*, the challenged entity, which the Court held was properly subject to suit under § 1983, was the Tennessee Secondary School Athletic Association, "a not-for-profit membership corporation organized to regulate interscholastic sport among the public and private high schools in Tennessee that belong to it." *Brentwood*, 531 U.S. at 291. As the district court observed in this case, the facts in *Brentwood* "remarkably parallel the present case." *Hughes*, 423 F. Supp. 2d at 718. Indeed, the facts in this case present an even stronger case for finding that Region VII acts under color of law. In *Brentwood*, public high schools constituted "84% of the Association's voting membership," *Brentwood*, 531 U.S. at 291, whereas governmental bodies—ten Michigan counties and the city of Saginaw—constitute *one-hundred percent* of the members of Region VII. Those eleven governmental entities each appoint a member to the twelve-person board of directors for Region VII, and their appointed representatives select the twelfth member.

Certainly we recognize that the Supreme Court has stated that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974). Unlike the utility company in *Jackson*, not only is Region VII subject to a host of state regulations—regulations that, as mentioned above, govern Region VII's operating procedures, its ability to make, cancel, or renew contracts, and the manner

in which it formulates the "area plan" for distributing the state and federal governments' funds—but also Region VII is a non-profit, membership corporation whose *sole* members are governmental entities. Thus, in addition to being regulated by the State, Region VII *is composed of* state entities and is permitted by statute to act as a designated area agency on aging only because Region VII "is under the supervision or direction of the state agency." MICH. COMP. LAWS § 400.589(1).

As the Supreme Court concluded in *Brentwood*, we conclude in this case that "[t]he nominally private character of [Region VII] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." 531 U.S. at 298. Indeed, we note that Defendants' appellate brief included several references to Region VII's responses to state Freedom of Information Act ("FOIA") requests for information filed by the Bay City Times. Appellees/Cross-Appellants Br. at 26-28. According to the Michigan Attorney General, however, the scope of Michigan's FOIA, which applies only to "public bodies," "does *not* include private non-profit corporations." SUMMARY OF MICHIGAN'S FREEDOM OF INFORMATION ACT, OFFICE OF THE ATTORNEY GENERAL, http://www.michigan.gov/ag/0,1607,7 -164-17337_18160-51242--,00.html (last visited Aug. 11, 2008) (emphasis added); *see also* Opinion No. 6563, Michigan Attorney General (Jan. 26, 1989), 1989 WL 445935, at *8, *available at* http://www.ag.state.mi.us/opinion/datafiles/1980s/op06563.htm (stating that "[i]t is my opinion, in answer to your final question, that the Freedom of Information Act does not apply to a private nonprofit corporation"). In responding to state FOIA requests, Region VII acted as though it were a public body. In view of the pervasive entwinement of governmental entities and representatives in the supervision and management of Region VII, as well as Region VII's own conduct manifesting an acceptance that it is a public body, we **AFFIRM** the district court's ruling that Region VII acted under color of law and is subject to suit under § 1983.

## B. Hughes's First Amendment Claim

### 1. Legal Standards

"We review a district court's decision granting summary judgment de novo." *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "In conducting the summary judgment analysis, we must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party," which is Hughes in this case. *Burchett*, 310 F.3d at 942.

"[I]n determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry. First, a court must ascertain whether the relevant speech addressed a matter of public concern." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). "Whether the speech at issue involves a matter of public concern is a question of law for the court, although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated." *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004) (internal citations omitted). In conducting our inquiry, we must assess "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. "Our review of the lower court's decision on this issue is *de novo*." *Farhat*, 370 F.3d at 589.

According to the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), we also must determine whether the employee's expressions were made "pursuant to his or her official responsibilities" or whether the "statements or complaints . . . [were] made outside the duties of

employment." *Id.* at 424. In *Garcetti*, the Supreme Court held that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities" and thus concluded that the plaintiff's First Amendment retaliation claim failed given that "the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties." *Id.*

Second, if we conclude that an employee's speech involved a matter of public concern and was not made pursuant to the employee's official duties, we then "must balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). "Defendant bears the burden of demonstrating that legitimate grounds existed justifying the termination." *Id.* at 601 (citing *Connick*, 461 U.S. at 150). In *Waters v. Churchill*, 511 U.S. 661 (1994), a plurality of the Supreme Court stated that "[i]t is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext," explaining that "[i]f an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with . . . the care that a reasonable manager would use before making an employment decision—discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case." *Waters*, 511 U.S. at 677-78 (plurality). The plurality reasoned that such care is necessary to avoid "the possibility of inadvertently punishing someone for exercising her First Amendment rights." *Id.* at 678 (plurality). As with the public-concern inquiry, the "[a]pplication of the *Pickering* balancing test is a matter of law for the court to decide." *Farhat*, 370 F.3d at 593.

Finally, we "must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee." *Rodgers*, 344 F.3d at 596 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), and *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000)).

## 2. Analysis

### a. Whether Hughes's Conversations with a Reporter for the Bay City Times Involved a Matter of Public Concern

As an initial matter, we note the district court's observation that "[t]he parties do not dispute that adverse employment actions did occur, i.e., that Defendant Region VII terminated [Hughes] and suspended her prior to that." J.A. at 1375 (Op. at 11). The district court also concluded that the evidence in this case presented genuine disputes of material fact regarding the element of causation and whether Region VII might "have terminated [Hughes's] employment regardless of her speech." J.A. at 1376-77 (noting Region VII's contention that Hughes "was tardy in attendance and in completing her work, and devoted substantial time to gossiping" as well as Hughes's rebuttal argument that "her April 2004 performance evaluation [contained] no negative marks"). On these issues, we agree with the district court.

The crucial issue in this appeal is thus whether Hughes's speech touched a matter of public concern. At her deposition, Hughes testified about her numerous conversations with a newspaper reporter, in which she primarily discussed allegations of sexual harassment against King, the executive director of Region VII, and Hughes's opinion that Region VII terminated Brady because Brady recommended that King be investigated in connection with the sexual-harassment allegations. The district court concluded that Hughes failed to show that her speech involved a matter of public concern; we disagree.

The evidence in this case shows that a newspaper reporter specifically sought out Hughes as a source regarding allegations of sexual harassment against the executive director of Region VII, an area agency on aging that is responsible for distributing a substantial amount of funds entrusted to the agency by the State of Michigan and the federal government. Further, the reporter testified in his deposition that, while Hughes was still an employee of Region VII, the reporter confirmed to King, the executive director, that Hughes was serving as a source for the reporter's critical articles regarding Region VII. In light of this evidence and the case law, we conclude that Hughes, in speaking to a reporter about allegations of sexual harassment against a public official, engaged in a constitutionally protected activity.

"Matters of public concern include speech that 'relat[es] to any matter of political, social, or other concern to the community.'" *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 146). In *Connick*, the Supreme Court offered examples of speech that would involve matters of public concern, such as statements "inform[ing] the public that [a governmental entity] was not discharging its governmental responsibilities" or statements "seek[ing] to bring to light actual or potential wrongdoing or breach of public trust on the part of" government employees. *Connick*, 461 U.S. at 148; *Rodgers*, 344 F.3d at 596. The Court in *Connick* also described an individual's "right to protest racial discrimination" as "a matter *inherently* of public concern." *Id.* at 148 n.8 (emphasis added). Likewise, we have stated that "it is well-settled that allegations of sexual harassment, like allegations of racial harassment, are matters of public concern." *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001). Finally, in *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988), we observed that our "finding of public concern is here strengthened by the fact that the plaintiff did not solicit the attention of the media, but simply responded to questions regarding an existing controversy." In *Matulin*, we described the Third Circuit's decision in *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988), as holding "that statements relating to charges of discrimination leveled at public employers and reported upon by newspapers *clearly involved* matters of public concern." *Matulin*, 862 F.2d at 613 (emphasis added).

At her deposition, Hughes testified that, like the plaintiff in *Matulin*, the reporter solicited her views. J.A. at 751 (Hughes Dep. at 41-42). Hughes also testified that she provided information to Neavling about *specific* instances of King's conduct toward Mott, the individual who had filed and settled a sexual-harassment lawsuit against King and Region VII. J.A. at 751-52 (Hughes Dep. at 44-46). For instance, Hughes recounted telling Neavling about King missing a meeting after receiving a call from Mott and about "witnessing Bruce [King] leave with Shelly [Mott]" from an evening event. J.A. at 751-52 (Hughes Dep. at 41-48). Hughes also stated that she told Neavling that Mott eventually became "concerned" and that Mott "asked other staff members to walk her to her car when she left the building." J.A. at 752 (Hughes Dep. at 46). Further, Hughes informed Neavling that Mott's lawsuit against King and Region VII had been settled, J.A. at 752-53 (Hughes Dep. at 48-49), which Hughes asserts led to Neavling and the Bay City Times submitting state FOIA requests "to confirm the information that he had received from Hughes." Appellant/Cross-Appellee Resp. & Reply Br. at 30; *see also* Appellee/Cross-Appellant Br. at 27 (discussing the numerous FOIA requests filed by Neavling). Hughes also recalled that she told Neavling that she "supported Diane Brady's position that the director [King] should have been investigated" regarding Mott's claims of sexual harassment, that she "felt that [Brady's termination] was related to the fact that [Brady] had wanted Shelly Mott's case [against King] to be investigated," and that Hughes did not think "that there was any basis for [Brady's] termination." J.A. at 752-53 (Hughes Dep. at 46, 50). Under the case law discussed above, such statements clearly address matters of public concern.

The district court, however, concluded that Hughes's deposition testimony contained only "generalized assertions" that "left the Court to guess at the contours of her speech" and that "[i]n the absence of more concrete content, it borders on impossible to test whether that speech reached a matter of public concern." J.A. at 1378 (Op. at 14); *see also* J.A. at 1377-78 (Op. at 13-14) (stating that Hughes has "provided only vacuous and generic claims" about the topics she discussed with

Neavling).   The quotes above, taken from Hughes's deposition, refute the district court's characterization of Hughes's evidence.  Hughes testified that, in her conversations with Neavling, she described specific events that pertained to Mott's lawsuit against King, informed Neavling that Mott had reached a confidential settlement with Region VII regarding her lawsuit, and informed Neavling of her opinion that Region VII had terminated Brady in retaliation for Brady's advocacy of an investigation into King's conduct in light of Mott's allegations.  Such evidence is more than sufficient to ascertain that Hughes's speech involved a matter of public concern.

In concluding that Hughes's speech did not touch a matter of public concern, the district court also erred in distinguishing Hughes's case from *Bonnell*, which the district court recognized as establishing that "claims of sexual harassment are a matter of public concern."  J.A. at 1378 (Op. at 14) (citing *Bonnell*, 241 F.3d at 813).  The district court characterized Hughes's statements as mere "personal opinions about the prudence of decisions made by her employer and supervisors" because her "alleged communications only recite the fact of another person's complaint and [Hughes's] assessment of her employer's response to that complaint."  J.A. at 1378 (Op. at 14).

The district court's reasoning on this point and its treatment of *Bonnell* is troubling for several reasons.  First, in characterizing Hughes's statements about Mott's sexual-harassment claim as mere "personal opinions about the prudence of decisions made by her employer and supervisors," the district court's reasoning would seemingly apply with equal force to the individual complaining of or exposing sexual or racial discrimination in the first instance, a position clearly contrary to *Bonnell* and the "well-settled" proposition that claims of discrimination by government officials and employers are matters of public concern.  Second, the district court's view that Hughes's second-in-time observations lack constitutional protection directly conflicts with our opinion in *Chappel v. Montgomery County Fire Protection District No. 1*, 131 F.3d 564 (6th Cir. 1997).  In *Chappel*, we soundly rejected the argument that "speech which addresses public corruption, but does not disclose it in the first instance, is *not* protected."  *Id.* at 577 (emphasis in original).  Indeed, we explained that "the defendants' suggestion that such speech is not protected, by virtue of its second-in-time status, is absurd."  *Id.*  Certainly, we acknowledged that speech that "breaks a story may be of greater concern to the public," but we emphasized that "it should be clear that a public employee's speech need not be fresh and enlightening to be considered speech on a matter of public concern."  *Id.* at 577-78.  Third, the district court overlooked that the evidence *did* in fact suggest that Hughes's speech offered new information regarding this matter of public concern:  Hughes informed Neavling that Mott's lawsuit had been settled, a fact that Neavling then confirmed pursuant to a state FOIA request.

Defendants advance several other arguments in support of the district court's conclusion that Hughes's speech did not involve a matter of public concern, but their arguments lack support in the record and are unpersuasive.  First, Defendants repeatedly argue from the premise that Hughes's speaking to Neavling was "not published or known until after [Hughes's] termination."  Appellees/Cross-Appellants Br. at 30; *see also id.* at 21-22 ("How can an employer punish an employee based upon the content of a statement if the employer does not know what the statement is?").  Defendants' assertion that they had no knowledge of Hughes speaking to Neavling simply ignores the record.  Both Hughes and Neavling testified at their depositions that Neavling had informed King that Hughes, while still a Region VII employee, was a source for the Bay City Times.  J.A. at 765 (Hughes Dep. at 97-99); J.A. at 2082-85 (Neavling Dep. at 25-28).  Indeed, as the district court recognized, Hughes also "offered evidence to show (1) that a co-worker might have overheard her three-minute conversation with Brady regarding FOIA [and] (2) that Defendant King had a list with six names, including hers, on his desk under a heading like 'Bay City Times.'"  J.A. at 1376 (Op. at 12).

Defendants advance a related argument that Hughes's conduct in speaking to a reporter about Region VII is unprotected because no published article quoted her prior to her termination.

Appellees/Cross-Appellants Br. at 25 (arguing that because the Bay City Times "never attributed information to [Hughes] prior to her termination[] Hughes' conduct is simply not the kind of 'speech' or expressive conduct protected by *Pickering*"). This argument lacks any merit as well. Answering a reporter's questions about a matter of public concern obviously constitutes expressive conduct, and the Supreme Court has explicitly held that an employee's speech need not be public to receive constitutional protection. *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979) (disagreeing with the court of appeals that "private expression of one's views is beyond constitutional protection"). Moreover, as mentioned above, Hughes offered additional evidence suggesting that King knew she had spoken to a reporter about events at Region VII.

We also note that in this case Defendants do not rely upon the Supreme Court's holding in *Garcetti* that "the First Amendment does not prohibit managerial discipline based on an employee's expressions *made pursuant to official responsibilities*." *Garcetti*, 547 U.S. at 424 (emphasis added). Defendants do cite *Garcetti* in the course of characterizing Hughes's alleged statements to her fellow employees in late June 2004 as mere "workplace grumble[s]" that do not "rise[] to the level of a constitutional issue," Appellees/Cross-Appellants Br. at 35, but this argument overlooks the Supreme Court's statement in *Garcetti* recognizing that "[e]mployees in some cases may receive First Amendment protection for expressions made at work" and emphasizing that "[t]he controlling factor in Ceballos' case is that his expressions were made *pursuant to his duties* as a calendar deputy." *Garcetti*, 547 U.S. at 420-21 (emphasis added). Most importantly, Defendants do not advance any argument that Hughes's statements—either to the reporter or to her co-workers—were made pursuant to her official duties. *Garcetti* thus does not bar Hughes's claims.

### b. Whether Hughes's Alleged Statements to Her Co-Workers in June 2004 Involved a Matter of Public Concern

Having concluded that Hughes's conversations with Neavling about Region VII touched a matter of public concern, we turn to the matter of Hughes's alleged statements to her co-workers in late June 2004 following a public meeting. First, we address some confusion regarding whether these alleged statements are the basis of an *additional* First Amendment retaliation claim separate from Hughes's claim stemming from her conversations with Neavling, or whether her alleged statements and the disciplinary sanction pertain instead to the causation analysis of a single First Amendment claim arising out of Hughes's conversations with Neavling.

In her appellate brief, Hughes describes her lawsuit as "claiming that Defendants/Appellees violated her First Amendment right of free speech in two separate incidents." Appellant/Cross-Appellee Br. at 15. In opposing summary judgment in the district court, however, Hughes argued that Defendants "fabricated" the nature of her alleged statements to her co-workers. J.A. at 1361 (Pls.' Reply to Defs.' Resp. Br. at 3). Hughes noted that "Defendants spoke with neither Kara Perez nor Denise Hughes to substantia[te] the specifics of the conversation between the two before Hughes was reprimanded" for her alleged statements in late June 2004, and Hughes argued that "Defendants' reprimand of Hughes was unjustified and *merely a pretext because of Hughes having provided information to the Bay City Times*." J.A. at 1361-62 (Pls.' Reply to Defs.' Resp. Br. at 3-4) (emphasis added). In an earlier brief opposing summary judgment, however, Hughes did contend "that she was reprimanded for protected speech in this instance" of her alleged statements to her co-workers, explaining that her comments involved a matter of public concern because "these proposed funding cuts by the State of Michigan to Region VII would have had a detrimental impact on the programs and services rendered to the senior citizens of the community to whom Region VII provided services." J.A. at 1081, 1087 (Pl.'s Resp. & Br. in Opp'n to Defs.' Second Mot. for Summ. J. at 2, 8)

Although her arguments were somewhat muddled and confusing, we conclude that Hughes sufficiently asserted a separate potential claim of First Amendment retaliation stemming from

Region VII's disciplinary measures taken in response to Hughes's alleged statements in June 2004 to her co-workers. The district court summarily concluded that Hughes's statements to her co-workers—statements about possible budget cuts and Hughes's desire to start a public lobbying campaign to keep state funding in place, J.A. at 762 (Hughes Dep. at 85)—did "not rise to a matter of constitutional concern" because "[n]othing in her purported conversations . . . raise[d] an inference of corruption, illegal activity, or abuse of public funds." J.A. at 1379 (Op. at 15). We disagree that Hughes's alleged statements lack constitutional protection. At her deposition, Hughes stated that her comments pertained to "looking for input on how we were going to try to look at promotions again, and if there was, you know, any state push that was being formed again because, you know, previously there was a whole big campaign that was put out to keep that funding in place." J.A. at 762 (Hughes Dep. at 85). Speech advocating a campaign to affect government policy is the essence of protected, political speech. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186-87 (1999) (stating that "'interactive communication concerning political change'" "is 'core political speech'" and that "First Amendment protection for such interaction, we agreed, is 'at its zenith'") (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)). As Hughes argues in her appellate brief, her statements were intended "to determine what she could do to help exert influence in the state political budgeting process." Appellant/Cross-Appellee Br. at 36.

Determining that Hughes's comments to her co-workers touched a matter of public concern leaves open several further questions to be resolved upon remand. For instance, Defendants contend that such advocacy-oriented statements were only a small part of what Hughes allegedly said. Orvosh testified that Williams informed him that Kara Perez was "upset" about Hughes's comments regarding the possible budget cuts and job consolidation. J.A. at 1793 (Orvosh Dep. at 115). Concerns that Hughes had lowered employee morale could furnish a valid basis for disciplining Hughes if Defendants believed that Hughes had scared another employee about losing her job. Indeed, in *Connick* the Supreme Court concluded that, even though the employee's speech did "touch[] upon matters of public concern" to a limited extent, the employee's discharge "did not offend the First Amendment" because that "limited First Amendment interest . . . d[id] not require that [the employer] tolerate action which [it] reasonably believed would disrupt the office . . . and destroy close working relationships." *Connick*, 461 U.S. at 154. Of course, under the plurality opinion in *Waters v. Churchill*, the decisionmaker must take the care in investigating the employee's alleged statement "that a reasonable manager would use before making an employment decision," 511 U.S. at 677-78, and the record here shows that Orvosh did not speak to either Perez or Hughes. Furthermore, Hughes bears the burden of showing that her speech, which she claims consisted of advocating a campaign to maintain Region VII's funding, "was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee," *Rodgers*, 344 F.3d at 596, and we find it somewhat difficult to understand why such speech—which would seem to align with Region VII's interests—would motivate the agency to retaliate against Hughes. Nonetheless, all these questions involve genuine and material factual disputes for the factfinder to resolve upon remand.

Perhaps the most important factual question to be resolved upon remand—and an issue which may clarify whether Hughes's June 2004 speech and discipline form a separate First Amendment claim or whether those incidents are better understood as part of the causation or pretext inquiry of Hughes's sole First Amendment claim relating to her conversations with Neavling—is the chronology (and existence) of the various statements in this case. That is, although Hughes and Neavling assert that King knew about Hughes's conversations with Neavling, King, at his deposition, denied ever having such a conversation with Neavling regarding Hughes's participation in interviews with the newspaper. J.A. at 1629 (King Dep. at 112) ("Q: Did Steve Neavling ever tell you that he had spoken with Denise Huges about issues involving – A: Never."). The factfinder might believe King and conclude that Defendants did *not* know about Hughes's conversations with Neavling, in which case Hughes's retaliation claim would clearly fail. On the other hand, the factfinder might determine that King became aware of Hughes's conversations with Neavling early

in the summer of 2004, perhaps on the basis of Hughes's testimony about seeing the list on King's desk or on the basis of Neavling's testimony.  In that case, if the factfinder determines that Defendants became aware of Hughes's conversations with Neavling prior to her statements to her co-workers in June 2004, the focus on Hughes's statements to her co-workers would seem to be most relevant as to determining whether Defendants possibly had a legitimate reason to discipline and ultimately discharge Hughes (lowering employee morale), or whether Region VII's disciplinary actions in June and July 2004 were merely a pretext for its retaliation against Hughes for speaking to the Bay City Times.  A yet further possibility is that the factfinder might determine that Defendants became aware of Hughes's conversations with Neavling only *after* the incidents giving rise to the reprimand and two-day unpaid suspension.  In that case, the district court should analyze as a separate retaliation claim whether Hughes's comments to her co-workers in June 2004 were a substantial or motivating factor in imposing the reprimand and two-day unpaid suspension; the district court should also then determine whether, under *Waters*, Defendants conducted a reasonable investigation into the nature of Hughes's alleged statements.

A final issue to be resolved upon remand is the *Pickering* balancing inquiry, in which "the court must balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  Because the district court concluded that Hughes's speech did not involve matters of public concern, the district court did not engage in the *Pickering* balancing inquiry.  At oral argument in our court, furthermore, counsel for Hughes requested that we remand the case to the district court to conduct the *Pickering* inquiry if we concluded that her speech involved a matter of public concern.

In sum, we hold that the district court erred in concluding that Hughes's speech did not involve matters of public concern.  We therefore **REVERSE** the district court's judgment in favor of Defendants on Hughes's First Amendment claims, and **REMAND** the case for further proceedings in light of the various factual and legal issues discussed above.

## C.  Hughes's FLSA Claim

### 1.  Legal Standards

Under the FLSA, a lawsuit to recover unpaid compensation must "be commenced within two years after the cause of action accrued," unless the cause of action arose "out of a willful violation," in which case the lawsuit must "be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).  "A cause of action is deemed to accrue, as a general rule, 'at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed.'" *Archer v. Sullivan County*, Nos. 95-5214, 95-5215, 1997 WL 720406, at \*2 (6th Cir. Nov. 14, 1997) (quoting *Halferty v. Pulse Drug Co.*, 821 F.2d 261, 271 (5th Cir.), *modified on other grounds*, 826 F.2d 2 (5th Cir. 1987)).

We have "addressed the application of equitable tolling in many employment discrimination cases involving both public and private employers," although we have acknowledged that "[o]ne theme that runs throughout these cases is that equitable tolling is to be carefully applied." *Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988).  "To determine whether to apply equitable tolling to time-barred claims, we generally consider five factors that include: (1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim." *Barry v. Mukasey*, 524 F.3d 721, 724 (6th Cir. 2008) (quotation omitted); *see also Andrews*, 851 F.2d at 151.  "These five factors are not comprehensive, nor is each factor relevant in all cases."

*Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006). We review "a district court's decision on the issue of equitable tolling *de novo* where the facts are undisputed." *Id.* at 932.

### 2. Analysis

The district court concluded that the FLSA's two-year statute of limitations barred Hughes's FLSA claims, and the district court dismissed Hughes's FLSA claims with prejudice. J.A. at 1369 (Op. at 5). Hughes pleaded her FLSA claims under two alternative theories. First, contending that she was a non-exempt employee, Hughes argued that Region VII "failed to pay her for up to 240 hours of 'comp' or 'flex' time, earned over the term of her employment, as required under the FLSA for non-exempt employees." J.A. at 1153 (Order at 2). Second, under the alternative theory that Hughes was a salaried and exempt employee, Hughes alleged "that Defendant Region VII must compensate her for two days lost pay when it suspended her on July 7-8, 2004," *id.*, given that 29 C.F.R. § 541.602(a) requires that, subject to certain exceptions, "an exempt employee must receive the full salary for any week in which the employee performed any work without regard to the number of days or hours worked." We conclude that the district court erred in determining that Hughes's FLSA claims were untimely filed, and, for the reasons explained below, we reverse its judgment dismissing Hughes's FLSA claims and remand for further proceedings on the merits of her claims.

As an initial matter, we must first determine when Hughes's FLSA claims accrued. As the district court noted, under Hughes's first theory, her FLSA claim for unpaid "flex" time "accrued on August 19, 2004, the last date on which Defendant owed her a payment." J.A. at 1156 (Order at 5). Under her second theory, Hughes's claim that her two-day unpaid suspension on July 7-8, 2004, violated § 541.602 accrued on July 22, 2004, the "regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Archer*, 1997 WL 720406, at *2 (internal quotation omitted); J.A. at 930 (Time & Attendance Record reflecting a July 22, 2004, payday for the period of July 5, 2004, to July 18, 2004). Thus, for Hughes's FLSA claim to be timely under *both* theories would require that we view her as having commenced her FLSA action prior to July 22, 2006.

The district court viewed Hughes's FLSA action as having been commenced on September 19, 2006, but we conclude that the doctrine of equitable tolling properly applies in this case such that the commencement of Hughes's FLSA claim instead occurred on July 17, 2006, when Hughes filed a motion for leave to file a second amended complaint. J.A. at 644-77. This filing included for the first time a claim under the FLSA. On July 27, 2006, the district court issued an order denying Hughes's motion for leave to file a second amended complaint on the ground that Hughes failed to comply with a local court rule requiring "a movant to seek concurrence in the relief requested before filing a motion with this Court." J.A. at 719-20 (Order). Hughes eventually complied with the local rule and her second amended complaint was formally filed on September 19, 2006. J.A. at 954-78 (Second Am. Compl.).

We conclude that, in light of the five factors outlined above, equitable tolling is appropriate in this case for several reasons. First, Defendants would suffer no prejudice in that the substance of Hughes's FLSA claims was made known on July 17, 2006, when Hughes's filed her motion for leave to file a second amended complaint, which included the allegations in support of her FLSA claims. That date was several days prior to the end of the earlier limitations period (July 22, 2006), which corresponded to her theory that she was a salaried, exempt employee, and it was nearly one month prior to end of the later limitations period (August 19, 2006), which corresponded to her theory that she was a non-exempt employee. Second, Hughes displayed reasonable diligence in pursuing her rights, as she attempted to amend her complaint within the limitations period. Further, Hughes argues that neither her "job description nor any . . . payroll records indicated that [Defendants] considered [Hughes] an exempt employee" and that she "was unable to ascertain her

exempt or non-exempt status until discovery had taken place in the instant matter." Appellant/Cross-Appellee Br. at 54.

In sum, because we conclude that July 17, 2006, was the date that Hughes commenced her FLSA action, her FLSA claims are timely under both theories that she advanced in the district court. Accordingly, we reverse the district court's judgment dismissing her FLSA claims and remand for further proceedings.

### III.  CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's ruling that Region VII is subject to suit under § 1983.  Because we conclude that Hughes's speech did relate to a matter of public concern and that Hughes's FLSA claims were timely, we **REVERSE** the district court's grant of summary judgment as to her First Amendment claim and the district court's dismissal with prejudice of her FLSA claims, and we **REMAND** for further proceedings consistent with this opinion.