Odis SOLOMON, Plaintiff–Appellee,

v.

ROYAL OAK TOWNSHIP, a Municipal
Corporation, and Tommy Staton,
Defendants–Appellants,

and

Marie Turner, et al., Defendants.

No. 86–1955.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 2, 1987.

Decided March 15, 1988.

Kenneth L. Lewis (argued), Detroit, Mich., for defendants-appellants.

Glen N. Lenhoff (argued), Flint, Mich., Mark J. Kriger, Detroit, Mich., for plaintiff-appellee.

Before MERRITT, KRUPANSKY and RYAN, Circuit Judges.

MERRITT, Circuit Judge.

In this civil rights appeal under 42 U.S.C. § 1983 of the District Court's order, 656 F.Supp. 1254, to reinstate Odis Solomon, a former member of the Royal Oak Township Police Department, the central issue is whether appellants violated Solomon's First Amendment right to freedom of speech when they discharged him for informing a newspaper reporter about departmental corruption. In addition, Tommy Staton, a member of the Township Board of Trustees, appeals the District Court's $10,000 damages award for the pendent state law claim of defamation. We affirm the District Court's determination that appellants discharged Solomon in violation of his First Amendment rights. However, we reverse the damages award against Staton for defamation and remand for further findings respecting one aspect of the defamation claim.

## I. Facts

The underlying facts grow out of a history of cronyism and alleged corruption in the public safety department of a small suburb of Detroit. Odis Solomon joined the Royal Oak Township Police Department in 1966 as a patrolman. He received several promotions during his employment and served as Public Safety Director (also known as Chief of Police) from 1974 through 1978. While Director, Solomon investigated acts of corruption by employees of the department and members of the Township Board of Trustees, resulting in a conviction of a Township official.

In 1981, Solomon was again named public Safety Director, and he continued to investigate allegations of corrupt behavior by Township employees. However, an auto accident in June 1984 forced him to stop work until November 1984. Sometime in late spring, Township Board member Tommy Staton and his wife told William Carmody, then Township Superintendent, that Solomon had raped Rhonda Scott, a police reserve officer and Staton's sister-in-law. Tommy Staton also told Carmody that Solomon sexually harrassed three other department employees. Based on the Statons' comments, Carmody asked the Michigan State Police to investigate the charges.

According to a Michigan State Police Crime Report, an officer telephoned Rhonda Scott on June 27, 1984, and in response to his questions concerning the rape allegations Scott stated, "I don't know what you are talking about." The officer asked Scott if she wanted to file criminal charges against Solomon, and she said she did not. Apparently, no other attempt by anyone was made to verify the Statons' rape allegations against Solomon. Not until April 9, 1985, almost a year later, did Scott prepare a written statement for the Royal Oak Police Department claiming that Solomon had raped her. In her report, Scott said she thought she had to have sex with Solomon in order to be hired as a full-time police officer. According to Solomon's testimony, he and Scott twice had consensual sex in late 1983. (Trial transcript Vol. 3, pp. 19, 121.)

One evening Solomon was watching the six o'clock news on television when he saw a TV reporter interview Staton. The reporter asked Staton whether there was an investigation of charges that Solomon raped and sexually harrassed employees in the department. A tape of the TV transcript was not introduced at trial and the

District Court was presented only with testimony from Staton and Solomon about what Staton actually said to the reporter. The undisputed trial testimony from Staton and Solomon shows that Staton told the reporter that there was an investigation of Solomon for sex harrassment and rape charges, and that the person he allegedly raped was Staton's sister-in-law. (Tr. trans. Vol. 2, pp. 147, 179; Vol. 3, pp. 36, 138.)

The trial transcript is unclear on exactly when the reporter interviewed Staton. The District Court appeared to assume the interview took place after the September 5, 1984, publication of a newspaper article reporting that the state police investigation was over and the state attorney general would not prosecute Solomon on any charges. However, Staton expressly testified that the TV interview occurred prior to the publication of the article, and Solomon said it took place June 27 or 28, 1984. (Tr. trans. Vol. 2, p. 146; Vol. 3, p. 36.)

At a Board meeting on July 19, 1984, while Solomon was still on sick leave, the Board passed a resolution making John Gatewood Acting Public Safety Director, and Cecil Dawson Lieutenant and second-in-command of the Department. Solomon returned to work November 12, 1984. Two days later a special Board meeting was called and the members approved a Staton motion for Gatewood to permanently replace Solomon as Public Safety Director. Solomon was again demoted on January 17, 1985, when the Board reorganized the department's employee's structure and changed his rank from Lieutenant to Patrolman.

In early 1985, Solomon learned that Dawson was using police department equipment and supplies for his own security business, J & D Investigations. Solomon also learned that Lindsey Hamm, arrested for disorderly public conduct and carrying a concealed weapon, was not prosecuted for the second charge and that two weeks later Dawson hired him to work for J & D Investigations.

Solomon testified that several times he tried to discuss with Gatewood what he had learned about Dawson and Hamm. (Tr. trans. Vol. 3, pp. 44–45, 152–157.) When no response came from Gatewood, Solomon telephoned the Michigan State Police Department and described the Dawson/Hamm relationship. During the state police investigation, it was discovered that Dawson had failed to submit fingerprints of several J & D Investigations employees, including Hamm. The state police arranged a hearing on this matter, but Dawson turned in his security guard license, ending the investigation. (Tr. trans. Vol. 2, p. 49.)

While gathering information for a newspaper article, a reporter telephoned Solomon and asked him questions about the Dawson/Hamm affair. Solomon made three statements to the reporter which were quoted in a March 15, 1985, *Royal Oak Tribune* article. The article quoted Solomon as stating that Dawson failed to press proper charges against Hamm and hired him "for his own personal gain." Solomon was also quoted as saying, "It's an obstruction of justice" and "It was totally ridiculous."

On March 18, Gatewood warned Solomon that he would be fired for any further statements to the press. Although Solomon obeyed Gatewood's order, soon after their meeting, Radio Station WWJ broadcast Solomon's statements printed earlier in the newspaper. Gatewood recommended on March 25 that the Board fire Solomon for speaking to the press. Solomon was discharged on April 26, 1985, after he had filed this civil rights suit against the Township. Solomon received his regular salary until June 3, when a hearing took place. The four-person tribunal upheld Solomon's discharge on August 1, 1985.

Solomon's complaint claimed violations of his First Amendment right to freedom of speech, and his Fourteenth Amendment right to a fair hearing prior to his demotions and discharge under the due process clause, and his right to access to courts under the equal protection clause. Solomon also claimed that Tommy Staton defamed him by telling a TV reporter that Solomon was under investigation for sexual

harrassment and rape charges. After a bench trial, the District Court ordered appellants to reinstate Solomon to the position of lieutenant, with full back pay and restoration of benefits, and awarded $10,000 damages against Staton for defamation. Appellants appeal the District Court's conclusions on all claims. However, because of our decision on the First Amendment issue, we need not reach the Fourteenth Amendment claims.

## II.  *First Amendment Liability*

The District Court's findings of fact and conclusions of law follow the requisite analysis for First Amendment claims under § 1983. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (plaintiff has the initial burden to show his conduct was constitutionally protected and was a substantial or motivating factor for the discharge; then the burden shifts to defendant to show by a preponderance of the evidence that it would have reached the same decision even if plaintiff had not engaged in protected conduct). The Court found that Solomon's statements to the reporter regarding the Dawson/Hamm affair were constitutionally protected under *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1982), and that Solomon was discharged solely because of these statements.

■ We agree with the District Court that Solomon's three statements quoted in a newspaper article and later radio broadcast were protected by the First Amendment. In *Connick,* the Supreme Court pinpointed the difficult issue presented in cases where a public employee is fired because of his speech:

[I]t has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression. Our task, as we defined it in *Pickering,* is to seek "a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees."

*Id.* at 142 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734) (other citations omitted).

In *Pickering,* the Supreme Court discussed several factors which courts should balance in determining whether a state employee's right to free speech prevails over a state's interest in preventing that speech. 391 U.S. at 569–73, 88 S.Ct. at 1735–37. These factors include whether the speech: related to an issue of public interest and concern; was likely to foment controversy and disruption; impeded the department's general performance and operation; affected loyalty and confidence necessary to the department's proper functioning; subverted department discipline; was false and the employer could not have easily rebutted or corrected the errors; and was directed toward a person whom the speaker normally contacted within the course of daily work. *Id.*

Together, Solomon's three statements divulged political corruption by the second-in-command of the Royal Oak Police Department. The statements, that Dawson failed to press full charges against Hamm so he could hire him "for his own personal gain" and that Dawson's acts amounted to "an obstruction of justice" and were "totally ridiculous," interpreted for the public the significance of Dawson's actions.

This Court has held that speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection. *See McMurphy v. City of Flushing,* 802 F.2d 191, 196 (6th Cir. 1986) (obviously, the public is concerned with how a police department is operated, and efforts to give public exposure to alleged misconduct are protected); *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir.1986) (public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law). *See also NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) (expression on public

issues "has always rested on the highest rung of the hierarchy of First Amendment values") (quoting *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)); *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964) (speech concerning public affairs is more than self-expression; it is the essence of self-government); *O'Brien v. Town of Caledonia*, 748 F.2d 403, 407 (7th Cir.1984) (a police officer's perception of potential graft and corruption are deserving of vigilant protection by the First Amendment); *Brockell v. Norton*, 732 F.2d 664, 668 (8th Cir.1984) (public has a vital interest in integrity of those commissioned to enforce the law); *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41, 46 (2d Cir.1983) (exposing of corrupt and wasteful practices obviously matter of public concern).

■ Defendants did not submit substantial evidence that Solomon's statements caused conflict or disruption, or that they impeded the department's normal operation. Gatewood and Dawson testified that Solomon broke the regular chain of command when he reported the suspected corruption to the Michigan State Police, rather than reporting the information to his superiors: Dawson, Gatewood, or members of the Board. If Solomon had followed the perceived chain of command, his efforts probably would have proved futile because Dawson, his direct supervisor, was the protagonist in the corruption. Moreover, it was reasonable for Solomon to assume that no investigation of Dawson would result by informing Gatewood or any Board members since they had twice demoted him within the past six months, and since many of them were the subjects of corruption investigations initiated by Solomon. Even assuming that a break in the chain of command amounted to some disruption of the department's routine operation, this claim is not consistent with the *Pickering* analysis, which focuses on disruption resulting from the speech, not from events prior to the speech. 391 U.S. at 571, 88 S.Ct. at 1736.

Although Solomon's statements directly questioned his superior's work performance, no evidence was presented that this form of disloyalty adversely affected the proper functioning of the department. On the contrary, Solomon's statements were made because the office was not functioning properly due to Dawson's malfeasance. *See Marohnic*, 800 F.2d at 616.

■ We also agree with the District Court that Solomon did not subvert departmental discipline according to the Public Safety Rules Manual. Solomon did not violate section 5.9 requiring employees to treat as confidential all official business of the department because the Dawson/Hamm scandal did not involve routine departmental business, and the public interest in the disclosure of corruption outweighs the state's interest in confidentiality. *See Marohnic*, 800 F.2d at 616; *O'Brien*, 748 F.2d at 407–08; *Hanneman v. Breier*, 528 F.2d 750, 756 (7th Cir.1976).

■ Solomon did not violate section 5.24(b)13 prohibiting the making of a false statement or report, because his statements appeared essentially true or were merely his opinion. Without determining if certain provisions of the Manual are unconstitutionally vague or overbroad, we conclude that Solomon's statements did not amount to insubordination under section 5.24(b)7, gossiping under 5.24(b)17, or giving information detrimental to the department under 5.24(b)19. The public interest in learning of corruption outweighs the state's interest in applying these rules to Solomon's speech. *See Hanneman*, 528 F.2d at 755.

*Pickering* also requires an analysis of whether the disputed statements are false. 391 U.S. at 570, 88 S.Ct. at 1735. The District Court concluded that Solomon's three statements are true. The first statement, "for his own personal gain," appears essentially true based on Dawson's actions as found by the District Court. The last statement, "It's totally ridiculous," is Solomon's opinion, and therefore cannot readily be labeled true or false.

The record is unclear whether the second statement, "an obstruction of justice," is

true or false. In *Pickering,* the Court accepted the Board of Education's conclusions that many of the employee's statements were false. 391 U.S. at 570, 88 S.Ct. at 1735. Nevertheless, it ruled that the Board was not justified in firing the employee where there was no effort to use the media to correct or rebut the errors, and no evidence that the employee intentionally or recklessly made false statements. 391 U.S. at 572, 574, 88 S.Ct. at 1736, 1737. Similarly, appellants presented no evidence that they attempted to correct or rebut Solomon's statements, nor did they present substantial evidence that Solomon intentionally made false statements. Therefore, even if some of Solomon's statements are false, under *Pickering,* this fact is not dispositive.

Finally, although it is true that Solomon's statements were directed to an individual with whom he worked on a daily basis, this factor alone does not override the public's interest in disclosure of corruption.

Having concluded that Solomon's speech was constitutionally protected, we next examine the remaining factors of the *Mt. Healthy* analysis. Defendants presented no evidence to the District Court that they were motivated by any reason other than Solomon's speech when they discharged him. Nor did defendants present any evidence that they would have fired Solomon even if he had not spoken to the reporter. We therefore affirm the District Court's decision that defendants violated Solomon's First Amendment rights when they discharged him for his speech.

### III.  *Defamation*

█ We reverse the District Court's decision that Tommy Staton's televised statements to a reporter about Solomon constituted defamation. According to Solomon, Staton told the reporter:

[T]here is an investigation on the Public Safety Director on sex harassment and

rape. The person that he allegedly raped happened to be my sister-in-law.

(Tr. trans. Vol. 3, p. 36.) Staton agreed at trial with this version of the televised interview. (Tr. trans. Vol. 2, pp. 147, 177, 179.)

The District Court explained that as a result of these statements, telecast to a large viewing audience, Solomon and his family suffered severe emotional and physical distress. The Court found that Solomon is deeply disturbed because his reputations at work and in the community are damaged; his wife and children no longer trust him; they are anguished and Solomon has seen them cry together; although once an avid churchgoer, Solomon no longer can face fellow parishioners and members of the community; and he has become withdrawn. For these injuries, the Court ordered Staton to pay Solomon $10,000.

The central question before us is whether Staton's statements are false, a requirement under both Michigan and federal law. *See Postill v. Booth Newspapers, Inc.,* 325 N.W.2d 511, 516 (Mich.App.1982); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed. 2d 783 (1986); *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). The evidence presented at trial indicates that Staton's first sentence is true, because at the time Staton made it, Solomon was the subject of a state police investigation for sexual harassment and rape charges.

The District Court appeared to give great weight to the assumption that this sentence was false because it was made after the investigation had ended. However, at trial both Staton and Solomon testified that the interview took place before the investigation's end. Staton testified that the interview occurred in early September, prior to the publication of a newspaper article reporting the investigation's conclusion. Solomon testified that the interview occurred June 27 or 28, soon after the investigation was initiated,[1] and more

---

1. Staton's trial testimony and Carmody's deposition indicate that Carmody initiated the state police investigation soon after Staton told him that Solomon raped Scott. No evidence indicates exactly when the investigation began. However, Carmody's deposition and the state police crime report indicate that it began sometime after May 2 and before June 25, 1984.

than two months before the investigation ended.

The District Court's theory that Staton's comments were made after the investigation ended, was apparently based in part on its finding that Scott disavowed her rape charge in late June, 1984. The Court assumed that at the time of the televised interview, Staton knew that Scott had recanted the rape charge. The only evidence of Scott's possible recantation was a Michigan State Police Crime Report, admitted into evidence without explanation. The report indicated that an officer telephoned Scott inquiring about the rape charge and she stated, "I don't know what you're talking about." She also refused to press criminal charges. Even assuming that Scott's response amounts to a recantation, the Court had no evidence before it that Staton knew or should have known the contents of this report when he spoke to the television reporter. Nor was there any evidence that Scott's telephone response had the effect of ending the investigation on Solomon. The attorney general and state police apparently did not view Scott's statement as ending the investigation since they did not announce its end until over two months later.

Staton's second sentence, that the person Solomon "allegedly raped is my sister-in-law," is also true. The District Court erroneously found that Staton told the reporter that Solomon "had raped" Scott. This finding is not supported by the trial testimony of Staton or Solomon who both stated that Staton said: "allegedly" raped. (Tr. trans. Vol. 2, pp. 147, 179; Vol. 3, pp. 36, 138.) Also, it was undisputed at trial that Scott is Staton's sister-in-law. For these reasons, we view Staton's second statement as true.

Solomon also argues on appeal that Staton defamed him when he told Carmody that Solomon raped Scott. The District Court briefly examined this conversation, but it did not specifically conclude that Staton's statements constituted defamation. The Court seemed to view the conversation as reflecting Staton's predisposition to make accusations against Solomon, rather than as a separate act of defamation. The Court made no findings of fact specifically as to what Staton told Carmody during this conversation. Nor did the Court make any finding that these statements are false or that they constitute defamation. It is also unclear from the Court's opinion whether the damages award against Staton was predicated in part on his statements to Carmody, in addition to his statements to the television reporter.

For these reasons, we remand the case to the District Court for the limited purpose of making specific findings of fact and conclusions of law on whether Staton's statements to Carmody constituted defamation and, if so, whether and to what extent Staton must pay damages to Solomon.

### IV. *Conclusion*

We affirm the District Court's decision to reinstate Solomon with full back pay and restoration of benefits. We reverse the damages award for defamation against Staton and remand for a determination of whether Staton defamed Solomon during the conversation with Carmody.