**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0257n.06
Filed: April 3, 2009

No. 08-3163

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOHN MILLER, JR., et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CITY OF CANTON, et al., | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |
| | ) | |

Before: GIBBONS and WHITE, Circuit Judges; TARNOW, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiffs-appellants John Miller, Jr., the

Canton Police Patrolman's Association ("Union"), and Steven Fowler appeal the district court's

grant of summary judgment in favor of defendants-appellees the City of Canton (the "City"), Safety

Director Bernard Hunt, Chief of Police Dean McKimm, Ronald Shank, and Gregory Boudreaux.

The plaintiffs allege that the defendants retaliated against them for speaking out against racial

discrimination within the City of Canton Police Department (the "Department"), in violation of their

civil rights. Fowler further alleges that the defendants discriminated against him because of his race.

For the reasons that follow, we affirm the grant of summary judgment as to all of Fowler's claims

and Miller's Title VII claim, but we reverse as to Miller's remaining claims and remand for trial on

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of
Michigan, sitting by designation.

those claims.

## I. BACKGROUND

This case arises out of allegations of racial discrimination in the Department. Miller is a white police officer and served as president of the Union, the collective bargaining unit for the nonranking members of the Department. Fowler is a black police officer and a member of the Union.

### A. John Miller and the Union

On August 4, 2004, Miller and the Union issued a seven-page press release alleging that Chief of Police Dean McKimm discriminated against black officers. According to the press release, McKimm treated black officers differently from their white peers, terminating black officers more frequently, disciplining black officers more harshly, and overlooking the achievements of black officers. The press release also alleged that McKimm abused his position to favor Pro Tech Alarm, a private security company owned by his brother. Further, the press release repeatedly emphasized that McKimm's conduct violated numerous departmental rules and regulations, opining that "it is obvious that Truthfulness, and Integrity are for everyone but [McKimm]." In conclusion, Miller called on the City to "take the corrective action needed," presumably to replace McKimm.

The press release was distributed during the Pro Football Hall of Fame Festival, when many tourists visit Canton, and attracted attention in local news outlets as well as *USA Today*. In response, Mayor Janet Weir Creighton hired the law firm of Baker, Dublikar, Beck, Wiley & Mathews to conduct an investigation of the allegations raised by the press release. Shortly thereafter, the firm issued its report concluding that the allegations of racial discrimination and rules violations were

unfounded but that the City "must address the perceptions of racial inequality."

Following the outside investigation, Safety Director Bernard Hunt directed Internal Affairs ("IA") to conduct an investigation into possible violation of Department rules by Miller. IA recommended that Hunt find that Miller violated six departmental rules in preparing the press release. A disciplinary hearing before Hunt was held as required by the collective bargaining agreement between the Union and the City. On April 4, 2005, Hunt released his report finding all six rule violations and suspending Miller without pay for sixty days, effective April 6, 2005 and ending on June 28, 2005. However, on December 12, 2005, Hunt ordered the City to pay full back pay and benefits previously denied Miller.

On October 10, 2006, Miller filed a complaint with the Ohio Civil Rights Commission ("OCRC") and Equal Employment Opportunity Commission ("EEOC") alleging that the City had retaliated against him "for participating in a protected activity, in violation of Title VII."

**B. Steven Fowler**

Fowler is one of four black officers identified in the press release as the target of discriminatory disciplinary action. Two complaints led to the disciplinary actions taken against Fowler–the first by Prince Gray arising out of Fowler's sexual relationship with Gray's wife, Wendy Gray, and the second by Zelma Ferguson arising out of Fowler's activities in the Unizan Bank Building.

First, Prince Gray filed a personnel complaint against Fowler alleging that Fowler was having a sexual relationship with Wendy Gray and abusing his position as an officer to have Prince arrested. An IA investigation concluded that Prince had been arrested but that Fowler was not involved.

3

However, IA found that disciplinary charges should be sustained because of Fowler's inappropriate relationship with Wendy. Fowler met Wendy when she filed a police report against Prince for domestic violence, and he subsequently engaged in a personal relationship with her including having sex with her on two occasions. By taking advantage of a vulnerable complainant, Fowler was found to have breached the trust placed in him as an officer, in violation of ethical standards and the rule on deportment. Moreover, Fowler lied to investigators about his relationship with Wendy, in violation of the rule on truthfulness. After a hearing, Hunt suspended Fowler without pay for fifteen days beginning on April 19, 2004 and ending on May 14, 2004. However, on March 14, 2006, Hunt reconsidered his decision, dismissed the charges, and ordered the City to make Fowler whole by paying the fifteen days' pay previously withheld.

Second, Zelma Ferguson, the administrator of a firm based in the Unizan Bank Building, complained that Fowler caused chaos in the building leading to a two-hour loss of productivity at the firm. Fowler, dressed in his police uniform, told employees on various floors of the building that he worked private security at night and wanted to see the floor plan during daytime hours and inquired about the building's alarm system and number of employees. Building employees began to suspect that Fowler was not in fact a police officer and became afraid, causing chaos that lasted several hours. Fowler admitted that he was inside the Unizan Bank Building, but he claimed that he had had a near-miss accident with a woman, Susan Crowther, earlier that day and entered the building in order to give her a warning.

An IA investigation determined that Fowler had no legitimate reason to be in the building, but rather made up the story in order to follow Crowther and ask her out on a date. While on patrol

Fowler noticed Crowther in her vehicle and followed her until she parked near the Unizan Bank Building. He then used the Department's Law Enforcement Assembly Data Service ("LEADS") system to run Crowther's license plate and determine her name and address. Fowler lied to gain entry into the Unizan Bank Building, where he located Crowther in her office and gave her his name and phone number. He also told Crowther that he knew her name and where she lived. Crowther did not give Fowler her number, but he later called her and left a message on her answering machine. IA determined that Fowler's conduct in and after the Unizan Bank incident violated eight department rules, including lying repeatedly to investigators about the incident. Further, Fowler likely violated Ohio law by using the LEADS database for personal, rather than law enforcement, purposes and by lying under oath at the arbitration.

McKimm recommended that Fowler be terminated from the Department and, after a hearing, Hunt agreed. Fowler's termination was effective May 15, 2004. However, on February 18, 2005, an arbitrator reduced the penalty to a disciplinary suspension without pay, due to Fowler's previously blemish-free record and the opinion of Fowler's captain that he was a "good officer" who should not be terminated. Consequently, the disciplinary suspension without pay lasted approximately nine months.

Also as a result of the Unizan Bank incident, Canton City Prosecutor Frank G. Forchione referred the matter to an independent prosecutor to determine if criminal charges were warranted. Forchione received the case from the City in February 2005 and submitted the case to Keith W. Warstler, Jr., of the Massillon Law Department, in March 2005. Warstler presented the case to the Stark County Grand Jury, which indicted Fowler on one count of Unauthorized Use of

Telecommunications Equipment in violation of Ohio Rev. Code § 2913.04.[1]

On April 28, 2004, Fowler filed a complaint with the OCRC and EEOC alleging that the City suspended and terminated him because of his race. The OCRC found that Fowler had not identified any white officers who were charged with violations similar to those for which Fowler was disciplined. Accordingly, the OCRC found that the allegation was not supported by the evidence. On May 15, 2006, the EEOC issued Fowler a right to sue letter.

**C. Procedural History**

On April 3, 2006, the plaintiffs brought suit in the United States District Court for the Northern District of Ohio. They asserted claims of racial discrimination, retaliation, and violation of their rights of freedom of speech and freedom of association pursuant to the First and Fourteenth Amendments to the United States Constitution; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981 and § 1983; and the Ohio Civil Rights Act, Ohio Rev. Code § 4112.01 *et seq.* The City moved for summary judgment on all claims and the matter was referred to United States Magistrate Judge Patricia A. Hemann.

The magistrate judge issued a Report and Recommendation ("R&R") with respect to Miller's and the Union's claims recommending that they be dismissed. As a threshold issue, the magistrate judge concluded that Miller's Title VII claim was barred by the statute of limitations because he failed to timely file a complaint with the EEOC.[2] As to the alleged First Amendment violation, the

---

[1] The appellate record does not reveal the disposition of the criminal case.

[2] At oral argument, counsel for Miller conceded that his EEOC complaint was untimely. We therefore affirm the dismissal of his Title VII claim as time-barred.

magistrate judge found that the press release did not constitute protected speech under the balancing test announced in *Pickering v. Board of Education*, 391 U.S. 563 (1968). Finally, the magistrate judge found that Miller established a *prima facie* case of retaliation but that no reasonable juror could conclude that the City's reasons for Miller's suspension were pretextual.

In a separate R&R, the magistrate judge recommended that all of Fowler's claims be dismissed. The magistrate judge found that Fowler could not establish a *prima facie* case of discrimination. Similarly, Fowler's claim for retaliation failed as a matter of law because he could not show that the City procured his indictment.

On January 9, 2008, the district court entered a final order adopting the findings of fact and conclusions of law of the magistrate judge and dismissing all claims with prejudice. This timely appeal followed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *Fieger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1116 (6th Cir. 2008). The City is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Univ. of Pittsburgh v. Townsend*, 542 F.3d 513, 522 (6th Cir. 2008). This court must review the record in the light most favorable to Miller and Fowler and must draw all reasonable inferences in their favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Vill. of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 377 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

### III. FIRST AMENDMENT CLAIM

"A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). Those rights, however, are subject to limits beyond what the Constitution allows for the general public. *See id.* Consequently, to establish a *prima facie* case of retaliation under 42 U.S.C. § 1983, a plaintiff must show that (1) the plaintiff engaged in constitutionally protected speech; (2) the public employer subjected the plaintiff to adverse action; and (3) the adverse action was motivated by the protected speech. *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006); *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 894 (6th Cir. 2006) (citing *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003)).

#### A. Constitutionally Protected Speech

To show that a public employee's speech is protected, a plaintiff must make two threshold showings. First, the plaintiff must show that the speech involves a matter of public concern. Second, the plaintiff must show that the speech was made outside the duties of employment. If both of these threshold showings are made, then we must balance the individual's interest against the government's interest under *Pickering*.

1.

Our analysis of whether a public employee's speech is protected begins with the "threshold" question whether the speech involves a matter of public concern. *Scarbrough*, 470 F.3d at 255; *see Connick v. Myers*, 461 U.S. 138, 143 (1983); *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008). This is a question of law determined by this court *de novo*. *Hughes*, 542 F.3d at 180; *Miller*, 448 F.3d at 894. We must consider "the content, form, and context of a given statement" in determining whether it involves a matter of public concern. *Connick*, 461 U.S. at 147-48. Matters of public concern include "any matter of political, social, or other concern to the community." *Id.* at 146. Allegations of racial discrimination by a public entity "inherently" involve a matter of public concern. *Id.* at 148 n.8; *see also Matulin v. Vill. of Lodi*, 862 F.2d 609, 612-13 (6th Cir. 1988) (holding that "allegations of invidious discrimination by a public employer" based on sex and disability implicate matters of public concern). So too do allegations of "possible corruption in a police department." *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007) (citing *Solomon v. Royal Oak Twp.*, 842 F.2d 862, 865-66 (6th Cir. 1988)). In this case the City concedes, as it must, that the press release involved a matter of public concern because it involved allegations of racial discrimination and public corruption.

2.

Additionally, we must determine at the threshold whether the public employee's speech was made "pursuant to his or her official responsibilities" or "outside the duties of employment." *Hughes*, 542 F.3d at 180 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006)). If the speech was made pursuant to the employee's official duties, then the plaintiff's First Amendment claim must

9

fail. *Hughes*, 542 F.3d at 180. Here, Miller was not doing what he was "employed to do" when he issued the press release. *See Garcetti*, 547 U.S. at 421-22; *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007). Rather, the press release fell outside of Miller's official duties as a police officer.

3.

Because Miller has passed both threshold tests, this court must engage in the balancing test set forth in *Pickering*. *Garcetti*, 547 U.S. at 418; *Hughes*, 542 F.3d at 180; *Scarbrough*, 470 F.3d at 255. We must determine the proper "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Garcetti*, 547 U.S. at 417 (quoting *Pickering*, 391 U.S. at 568). The government's interests may be implicated where the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The weight given to the governmental interests varies depending on the nature of the protected speech. *Connick*, 461 U.S. at 150. The government must make a "particularly strong showing" where the speech "substantially involve[s] matters of public concern." *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001) (alteration in original) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737-38 (6th Cir. 2000)). Here, the press release substantially involved matters of public concern because the "vast majority" of the press release touched on issues of racial discrimination and public corruption. *See Leary*, 228

10

F.3d at 737. Accordingly, the City must "make a particularly strong showing that the employee's speech interfered with workplace functioning." *See id.*

In this case, the City cannot make the necessary showing. The City has not put any evidence in the record to support its claim that the press release caused disruption in the workplace. Rather, the City points to an internal report, prepared by Hunt, concluding that the press release was *calculated* to cause disruption. Summary judgment is improper, however, where the government's interest rests on merely potential harm. *See City of Elyria*, 502 F.3d at 493 ("Other than [the police chief's] own statement to another officer that an FBI investigation would affect police department morale, there is no evidence that [plaintiff's] complaints to the FBI actually impeded the police department's general performance and operation or affected loyalty and confidence necessary to the department's proper functioning."); *Solomon*, 842 F.2d at 866 ("Although [plaintiff police officer's] statements directly questioned his superior's work performance, no evidence was presented that this form of disloyalty adversely affected the proper functioning of the department."); *see also Matulin*, 862 F.2d at 614 (noting that, despite the defendants' arguments that plaintiff police officer's statements created a "lack of trust" in the department, they failed to present any evidence at trial of disruption). Moreover, the Safety Director's "conclusory report" is insufficient to outweigh Miller's First Amendment interests. *See Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir. 1991) (finding assistant fire chief's "controversial" speech regarding affirmative action protected where there was no evidence of disruptive effect "other than the conclusory report" prepared by Assistant Director of Safety after a hearing). Here, as in the cases cited, there is no evidence that the plaintiff's speech actually disrupted working relationships or affected the Department's proper functioning.

The City relies heavily on *Graham v. City of Mentor*, 118 F. App'x 27 (6th Cir. 2004), for the proposition that speech "calculated to create division" may be unprotected. To the extent that *Graham* is good authority,[3] it is distinguishable. In *Graham*, the protected speech consisted of officers' allegations that the police chief "fixed" parking tickets, secured lower fines for friends, improperly took paid compensation time, and carried a weapon though he was unqualified to do so. *Id.* at 28-30. Thus the speech concerned issues that, while important, were less of a public concern than those presented in this case. In contrast, here the speech at issue concerned matters of the highest public concern–allegations of racial discrimination by a public employer. Consequently, while the potential for disruption was found to be sufficient in *Graham*, a stronger showing on the government's part is required here.

Weighing in Miller's favor, the majority of the press release was devoted to issues of pressing importance–racial discrimination in the police department. Weighing in the City's favor, these

---

[3]*Graham* was an unpublished case that cited extensively *Brown v. City of Trenton*, 867 F.2d 318 (6th Cir. 1989), and *McMurphy v. City of Flushing*, 802 F.2d 191 (6th Cir. 1986), for the proposition that speech "calculated to create division" is not protected. Neither of those cases is on point, however, because in each the court determined that the officers' speech did not involve a matter of public concern. In *Brown*, the court concluded that the officers were "disgruntled" and abused the news media to air their "grievances" about internal department functioning where there was "no hint" of "any breach of public trust." 867 F.2d at 322. On these facts, the officers' speech did not involve a matter of public concern and the balance of interests tipped heavily in favor of the government. Similarly in *McMurphy*, the court concluded that the plaintiff officer "acted out of spite and frustration . . . rather than for the purpose of illuminating matters of public concern" in that the plaintiff made threats, called the chief of police a "backstabbing son-of-a-bitch," and posted vulgar cartoons on an internal bulletin board. 802 F.2d at 194-95. Here, it is uncontested that the press release involved matters of public concern. *Brown* and *McMurphy* are inapposite to a situation where, as here, the officer's speech involved a matter of inherent public importance. It is also important to note that the court's threshold finding that the speech did not involve matters of public concern renders the subsequent *Pickering* balancing in both cases *dicta*. *See Miller*, 448 F.3d at 895.

issues were presented in a manner that personally attacked McKimm. Although the personal attacks were unnecessary, they are similar to statements that the police lieutenant acted "for his own personal gain" and that the lieutenant's actions were "an obstruction of justice" and "totally ridiculous"–statements that we have found to be protected. *See Solomon*, 842 F.2d at 864. An additional fact given great significance by the City is that the press release was timed to coincide with the Pro Football Hall of Fame Festival. The City contends that the timing reveals Miller's motive to embarrass the City at the one time of year it enjoyed tourists. Drawing the reasonable inferences in Miller's favor, however, as we must, the timing could show Miller's intent to attract national attention to force the City to address the matters raised by the press release. Weighing all the evidence, the City's interest in maintaining loyalty within the police force did not outweigh Miller's interest in exposing racial discrimination by the City. The City has cited no evidence that the press release actually disrupted its effectiveness or otherwise impaired working relationships, nor of any other interest that would justify restricting Miller's speech. Accordingly, Miller's speech was protected by the First Amendment.

**B. Adverse Action**

To proceed to trial, Miller must also establish the adverse action and causation elements of a First Amendment retaliation claim. Adverse action means "an injury that would likely chill a person of ordinary firmness from continuing to engage in [the protected] activity." *Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 478 (6th Cir. 2006); *see also Scarbrough*, 470 F.3d at 255. Here, Miller was suspended without pay for sixty days from April to June 2005. Although he was later made whole in December 2005, a reasonable jury could find that the loss of

pay for sixty days would constitute a hardship to the average officer and would chill the exercise of First Amendment rights.

### C. Causation

An adverse action is motivated by protected speech if the speech was "a substantial or motivating factor" in the adverse action. *Hughes*, 542 F.3d at 181; *Miller*, 448 F.3d at 894. Put differently, a plaintiff satisfies the motivation element by showing that the adverse action "was motivated at least in part" by the protected speech. *Scarbrough*, 470 F.3d at 255; *Nair*, 443 F.3d at 478. Here, the City does not contest that it took disciplinary action against Miller because of the press release, although it maintains that the contents were not protected. A reasonable jury could find that the City suspended Miller because of the exercise of his civil rights. Therefore, Miller has made out a prima facie case of retaliation under § 1983.

In sum, Miller's speech was protected under *Pickering*, and a reasonable jury could find that the City suspended Miller because of the exercise of his civil rights. Therefore, the City was not entitled to summary judgment on this claim.

### IV. RACIAL DISCRIMINATION CLAIM

Fowler claims that the City discriminated against him in that the City treated him, as a black officer, more harshly than it treated white officers accused of similar rule violations. This disparate treatment is alleged to have violated Title VII, 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981(a), and Ohio Rev. Code § 4112.02(A). This court applies the *McDonnell Douglas/Burdine* framework to discrimination claims arising under all three laws. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). *See generally Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas/Burdine*, a plaintiff makes out a *prima facie* case of discrimination by showing that: "1) he is a member of a protected class; 2) [he] was qualified for the job; 3) he suffered an adverse employment decision; and 4) [he] was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). Although Fowler can make out the first three elements of a *prima facie* case, he failed to show that he was treated differently from similarly situated white officers.[4] In the district court, Fowler pointed to three white officers who he alleged were similarly situated to him–Sam Frisone, Greg Gilmore, and Michael Lombardi. At oral argument before this court, however, Fowler conceded that these officers were not similarly situated to him. Instead, Fowler pointed to Captain Vega, Captain Ream, and Officer Myers. However, as counsel for Fowler acknowledged, there is no evidence in the record regarding these officers. We are unable to find, therefore, that Vega, Ream, or Myers were similarly situated to Fowler and treated differently from him. Because Fowler failed to make out the fourth element of his *prima facie* case, his claim for racial discrimination cannot survive the City's motion for summary judgment.

## V. RETALIATION CLAIMS

Miller and Fowler each claim that the City retaliated against them for speaking out against

---

[4]Fowler also argued before the trial court that he was replaced by a white officer. The magistrate judge rejected this argument, and Fowler did not present it to this court.

racial discrimination within the Department, in violation of Title VII, 42 U.S.C. § 2000e-3(a);[5] 42

U.S.C. § 1981(a); and Ohio Rev. Code § 4112.02(I). This court considers retaliation claims brought

pursuant to all three laws under the same analytical framework applied to claims under Title VII.

*Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004); *Abbott v. Crown Motor Co.*, 348 F.3d

537, 541 (6th Cir. 2003); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000); *see also*

*Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991).

A *prima facie* case of retaliation under Title VII has four elements: (1) the plaintiff engaged

in activity protected by Title VII; (2) the defendant knew about this fact; (3) the defendant took

adverse action against the plaintiff; and (4) the protected activity and the adverse action were

causally connected. *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (quoting

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)); *Russell v. Univ. of Toledo*, 537 F.3d

596, 609 (6th Cir. 2008). Protected activity includes opposing any employment practice that the

employee reasonably believes to be discriminatory, "whether or not the challenged practice

ultimately is found to be unlawful." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir.

2000) (citation omitted).

For retaliation purposes, an adverse action is any action by an employer "that would have

been materially adverse to a reasonable employee or job applicant," meaning that the employer

action "could well dissuade a reasonable worker from making or supporting a charge of

---

[5]As indicated in note 2 *supra*, we affirm the dismissal of Miller's Title VII claim as time-barred. We analyze his remaining claims brought under § 1981(a) and § 4112.02(I) using the same Title VII framework.

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008). Adverse action is not limited to harms "that are related to employment or occur at the workplace." *Burlington N.*, 548 U.S. at 57. In this respect, Title VII's anti-retaliation provision is broader than Title VII's discrimination provision. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).

A plaintiff "easily" makes out a *prima facie* case of retaliation. *McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 335 (6th Cir. 2006) (citation omitted). Once the plaintiff has made out a *prima facie* case of retaliation, the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse action. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). If the employer satisfies this burden of production, then the burden of production shifts back to the plaintiff to show "that the proffered reason was not the true reason for the employment decision." *Id.* (quoting *Burdine*, 450 U.S. at 256). The burden of persuasion, however, always remains on the plaintiff. *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 793 (6th Cir. 2000).

**A. Miller**

Here, Miller has made out a *prima facie* case of retaliation. First, the press release was protected activity in that Miller reasonably believed that McKimm was engaged in racial discrimination. Second, the City knew about the press release. Third, as has already been shown, a sixty-day suspension without pay could dissuade a reasonable worker from making a charge of discrimination. *See Burlington N.*, 548 U.S. at 70; *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736-37 (6th Cir. 2006). Finally, the City admits that there is a causal connection between the

press release and the suspension, although it maintains that the reason it suspended Miller due to his rule violations rather than the protected content of the press release.

Because Miller has made out a *prima facie* case of retaliation, the burden of production shifts to the City to come forward with a legitimate, nondiscriminatory reason for the suspension. The City does not dispute that it suspended Miller because of his speech. The City argues, however, that the reason for the suspension was Miller's failure to follow protocol rather than the content of the speech. Miller has shown enough facts such that a reasonable jury could reject the City's explanation as pretextual and find that the contents of his speech–his complaints of racial discrimination–motivated the suspension. Therefore, the City was not entitled to summary judgment on Miller's retaliation claims.

### B. Fowler

As to Fowler, his *prima facie* case fails because he cannot show the requisite causal connection between the protected activity and the indictment. A reasonable jury could find that Fowler engaged in protected activity in that the August 4, 2004 press release identified him by name as a black officer who received unfair treatment by McKimm. Further, Fowler testified at his deposition that he spoke out at a May 5, 2005 special meeting for black officers to discuss problems within the Department. As noted, the City knew about the press release, though it is unclear if the City was aware of the May 5, 2005 meeting. We assume without deciding that a reasonable jury could find that the City's turning over evidence to the Canton Law Department was an adverse action, even though the ultimate decision to seek an indictment belonged to the independent prosecutor. *See Dokes v. Jefferson County, Ohio*, 61 F. App'x 174, 178-79 (6th Cir. 2003). *But see*

*id.* at 181-82 (Gwin, J., concurring in the result); *Lentz v. City of Cleveland*, 410 F. Supp. 2d 673, 692-93 (N.D. Ohio 2006). However, Fowler cannot show a causal connection between the protected activity and the indictment. Even if the City were aware of the May 5, 2005 special meeting, that meeting occurred three months after the City referred the Unizan Bank matter to the Law Department in February 2005. Therefore, Fowler cannot show a causal connection between the meeting and the indictment. *See Dokes*, 61 F. App'x at 179. As to the press release, approximately six months elapsed between the press release and the turning over of evidence to the Law Department. Where the protected activity and allegedly retaliatory action are separated by six months, however, more than temporal proximity must be shown to establish a causal connection. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 718 (6th Cir. 2007); *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999). Fowler, however, has offered no other evidence of causation. Because Fowler cannot show a connection between the protected activity and the adverse action, his *prima facie* case of retaliation fails.

## VI. CONCLUSION

For the foregoing reasons, we affirm the grant of summary judgment as to all of Fowler's claims and as to Miller's Title VII claim, reverse as to Miller's claims brought under 42 U.S.C. § 1981 and § 1983 and Ohio Rev. Code § 4112.02(I), and remand for further proceedings consistent with this opinion.